O

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

CARLOS MARTINEZ,          ) Case No. CV 11-10082-JPR
                           )
             Plaintiff,  )
                           ) MEMORANDUM OPINION AND ORDER
         vs.         ) AFFIRMING THE COMMISSIONER
                           )
MICHAEL J. ASTRUE,       )
Commissioner of the Social )
Security Administration,   )
                           )
           Defendant.  )
_____)

**I.   PROCEEDINGS**

Plaintiff seeks review of the Commissioner's final decision denying his application for Social Security disability insurance benefits ("DIB") and Supplemental Security Income benefits ("SSI").  The parties consented to the jurisdiction of the undersigned U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). This matter is before the Court on the parties' Joint Stipulation, filed September 20, 2012, which the Court has taken under submission without oral argument.  For the reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

1

**II.   BACKGROUND**

Plaintiff was born on October 14, 1969.  (Administrative Record ("AR") 140.)  He completed nine years of education in El Salvador.  (AR 29-30.)  Plaintiff has previously worked as a packer in a warehouse, a plastic cutter, a machine operator, a forklift operator, and a welder.  (AR 32-42.)

On May 14, 2004, Plaintiff was hurt at work when a loaded pallet struck him on the right lower leg and shin, puncturing the skin.  (AR 65.)  In September 2004, Plaintiff filed an application for SSI benefits, which an Administrative Law Judge ("ALJ") granted on June 29, 2006, after finding that Plaintiff had been disabled during a closed period from May 14, 2004, to November 6, 2005, because of a contusion and puncture laceration of the right leg, tendonitis of both shoulders with possible impingement, osteoarthritis of the right shoulder, and osteoarthritis of the left knee medial.  (AR 63-71.)  Plaintiff's SSI benefits ceased at the end of January 2006, which was the second month after his disability ended.  (AR 71.)

On June 4, 2009, Plaintiff filed the instant SSI and DIB applications, alleging that he had been unable to work since December 24, 2008, because of fibromyalgia and back pain.  (AR 140-47, 168, 201.)  Plaintiff later alleged that his disabilities included "foot nerve damage," a hernia, and depression.  (AR 201.)  After Plaintiff's applications were denied, he requested a hearing before an ALJ.  (AR 76-80, 82-92.)  A hearing was held on November 3, 2010, at which Plaintiff, who was represented by counsel, appeared and testified through an interpreter.  (AR 29-55.)  Vocational Expert ("VE") Jane Hale also testified.  (AR 56-

2

1   61.)  In a written decision issued on December 23, 2010, the ALJ
2   determined that Plaintiff was not disabled.  (AR 10-19.)  On
3   October 13, 2011, the Appeals Council denied Plaintiff's request
4   for review.  (AR 1-5.)  This action followed.

5   **III.  STANDARD OF REVIEW**

6       Pursuant to 42 U.S.C. § 405(g), a district court may review
7   the Commissioner's decision to deny benefits.  The ALJ's findings
8   and decision should be upheld if they are free from legal error
9   and are supported by substantial evidence based on the record as
10  a whole.  § 405(g); Richardson v. Perales, 402 U.S. 389, 401, 91
11  S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481
12  F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such
13  evidence as a reasonable person might accept as adequate to
14  support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter
15  v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than
16  a scintilla but less than a preponderance.  Lingenfelter, 504
17  F.3d at 1035 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880,
18  882 (9th Cir. 2006)).  To determine whether substantial evidence
19  supports a finding, the reviewing court "must review the
20  administrative record as a whole, weighing both the evidence that
21  supports and the evidence that detracts from the Commissioner's
22  conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir.
23  1996).  "If the evidence can reasonably support either affirming
24  or reversing," the reviewing court "may not substitute its
25  judgment" for that of the Commissioner.  Id. at 720-21.

26  **IV.  THE EVALUATION OF DISABILITY**

27      People are "disabled" for purposes of receiving Social
28  Security benefits if they are unable to engage in any substantial

gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted, or is expected to last, for a continuous period of at least 12 months.  42 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257 (9th Cir. 1992).

     A.   <u>The Five-Step Evaluation Process</u>

     The ALJ follows a five-step sequential evaluation process in assessing whether a claimant is disabled.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as amended Apr. 9, 1996).  In the first step, the Commissioner must determine whether the claimant is currently engaged in substantial gainful activity; if so, the claimant is not disabled and the claim must be denied. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the second step requires the Commissioner to determine whether the claimant has a "severe" impairment or combination of impairments significantly limiting his ability to do basic work activities; if not, a finding of not disabled is made and the claim must be denied. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  If the claimant has a "severe" impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment or combination of impairments meets or equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the

Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[1] to perform his past work; if so, the claimant is not disabled and the claim must be denied.  §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  The claimant has the burden of proving that she is unable to perform past relevant work.  <u>Drouin</u>, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  <u>Id.</u>  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy.  §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis.  §§ 404.1520, 416.920; <u>Lester</u>, 81 F.3d at 828 n.5; <u>Drouin</u>, 966 F.2d at 1257.

      B.   <u>The ALJ's Application of the Five-Step Process</u>

    At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since December 24, 2008.  (AR 12.)  At step two, the ALJ concluded that Plaintiff had the severe impairments of "disc desiccation at L4-5 and L5-S1 with moderate to significant central canal stenosis at L4-5 secondary to a 6 mm disc protrusion," "a 2.5 mm disc protrusion with annular tear at L5-S1," "facet degenerative joint disease at L5-S1 and L4-5," "status post blunt trauma puncture wound of the

_____

[1]   RFC is what a claimant can still do despite existing exertional and nonexertional limitations.  20 C.F.R. §§ 404.1545, 416.945; <u>see</u> <u>Cooper v. Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

right lower extremity," gastroesophageal reflux disease, and depression.  (AR 12-13.)  At step three, the ALJ determined that Plaintiff's impairments did not meet or equal any of the impairments in the Listing.  (AR 13.)  At step four, the ALJ found that Plaintiff retained the RFC to perform "light work,"[2] with the limitations that Plaintiff "can perform postural activities occasionally, cannot climb ladders, ropes, or scaffolds, cannot work around heights and hazards, and is limited to simple to moderately complex work."  (AR 13.)  Based on the VE's testimony, the ALJ concluded that Plaintiff was unable to perform any of his past relevant work.  (AR 17.)  At step five, the ALJ concluded that jobs existed in significant numbers in the national economy that Plaintiff could perform.  (AR 18.)  Accordingly, the ALJ determined that Plaintiff was not disabled.  (AR 18-19.)

**V.   RELEVANT FACTS**

Between 2004 and 2008, doctors at Crown City Medical Group diagnosed Plaintiff with, among other things, fibromyalgia, gastroesophageal reflux disease, and low-back pain.  (AR 537-58, 580, 576-80.)

---

[2]    "Light work" is defined as work involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. §§ 404.1567(b), 416.967(b).  The regulations further specify that "[e]ven though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Id.  A person capable of light work is also capable of "sedentary work," which involves lifting "no more than 10 pounds at a time and occasionally lifting or carrying [small articles]" and may involve occasional walking or standing.  §§ 404.1567(a)-(b), 416.967(a)-(b).

Dr. Philip A. Sobol, a board-certified orthopedic surgeon, was Plaintiff's primary treating physician in multiple workers' compensation cases beginning in 2001.  (AR 582.)  On July 18, 2008, Dr. Daniel J. Paveloff, who worked with Dr. Sobol and was board certified in physical medicine and rehabilitation and electrodiagnostic medicine, reevaluated Plaintiff.  (AR 243-49.) Dr. Paveloff noted that Plaintiff complained of right leg pain and skin irritation and prescribed Lidoderm patches.  (AR 244, 246.)  He found that Plaintiff could work with the unidentified restrictions that Dr. Sobol had found in a December 2004 assessment.  (AR 247.)

On September 7, 2008, Plaintiff visited the emergency room at Huntington Memorial Hospital, stating that his car had been rear-ended the previous day and he was having low-back and upper-right-back pain.  (AR 256.)  X-rays were negative and Plaintiff was diagnosed with back muscle strain and given Motrin.  (AR 257.)

On October 1, 2008, Plaintiff again visited the emergency room at Huntington Memorial Hospital, where he complained of low-back pain and acknowledged lifting heavy objects improperly at work.  (AR 252-53.)  He was prescribed Motrin, Vicodin, and Robaxin and told to avoid heavy lifting, wear a back brace, and follow up with his regular doctor and physical therapy as scheduled.  (AR 253.)

On October 9, 2008, Dr. Maria V.G. Sioson-Avala at Crown City Medical Group noted that Plaintiff complained of chronic low-back pain that sometimes radiated to his right leg; she ordered CT scans and recommended that Plaintiff limit weight-

7

bearing activity, wear a brace for support, and take Motrin.  (AR 285.)

On December 3, 2008, as part of Plaintiff's workers' compensation case, Dr. Philip M. Lichtenfeld noted that he had seen Plaintiff on September 19 for complaints of spasm and pain in his cervical, thoracic, and lumbar spine.  (AR 262.)  Since that time, Plaintiff had been treated with physical therapy, chiropractic manipulations, Motrin, and Robaxin, which had improved his symptoms.  (AR 267.)  Dr. Lichtenfeld found that Plaintiff's cervical spine had only slight muscle spasm and full range of motion, his thoracic spine had slight to moderate muscle spasm with slight tenderness to palpation and range of motion, and his lumbar spine had no muscle spasm with slight to moderate pain on palpation and limited range of motion with flexion to 65 degrees, extension to 25 degrees, and bending to 30 degrees.  (AR 268.)  Dr. Lichtenfeld concluded that Plaintiff had received maximum improvement with conservative treatment and discharged him from his care.  (Id.)

On June 10, 2009, Dr. Sioson-Avala noted that Plaintiff complained of back pain and wanted her to sign a disability form, which she declined to do.  (AR 284.)  On June 24, 2009, Dr. Sobol found that Plaintiff had tenderness around the lumbar spine, positive straight-leg tests, and reduced ranges of motion of the lumbar spine.  (AR 392.)  Plaintiff's lower extremities had decreased sensation to pinprick and light touch, but he had normal muscle bulk and tone and no atrophy, spasticity, or motor weakness.  (AR 393.)  Dr. Sobol diagnosed Plaintiff with "[l]umbosacral musculoligamentous sprain/strain with attendant

1  bilateral lower extremity radiculitis, right side worse than

2  left." (AR 394.)  He also noted Plaintiff's "complaints of

3  depression, anxiety and stress, associated with insomnia

4  secondary to chronic pain and disability" and "complaints of

5  gastrointestinal upset," but he deferred those issues to the

6  appropriate specialist. (Id.)  Dr. Sobol recommended physical

7  therapy and prescribed Norco, Norflex, Dendracin pain gel, and a

8  low-back support. (AR 394-95.)  On June 25, 2009, Dr. J. Babaran

9  at Crown City Medical Group noted Plaintiff's complaints of

10  right-foot problems and diagnosed traumatic injury of the right

11  leg, rule out fracture. (AR 283.)

12      On August 7, 2009, Dr. Sahniah Siciarz-Lambert, a board-

13  certified internist, examined Plaintiff and completed an

14  internal-medicine evaluation at the Social Security

15  Administration's request. (AR 342-47.)  Plaintiff reported that

16  he had been diagnosed with fibromyalgia and suffered from neck,

17  shoulder, back, and right-thigh pain; nausea; depression; and

18  anxiety. (AR 342.)  After noting that Plaintiff behaved in "a

19  very helpless manner" throughout the evaluation (AR 343-44), Dr.

20  Siciarz-Lambert stated that she could not endorse Plaintiff's

21  fibromyalgia diagnosis because of his "significant depression

22  overlay" (AR 346).  Dr. Siciarz-Lambert noted that Plaintiff

23  "feels that his major problem is the depression and anxiety," and

24  she believed that "the somatization expressed is a consequence of

25  the psychiatric component." Id.  Dr. Siciarz-Lambert, moreover,

26  tested Plaintiff for fibromyalgia using the American Rheumatology

27  Association criteria and found "a significant discordance between

28  the discreet testing and the direct testing" of fibromyalgia

9

tender points, noting that Plaintiff had no pain in any tender point on discreet testing but moderate or severe pain in all tender points on direct testing.[3]   (Id. at 344-46.)   Dr. Siciarz-Lambert noted that Plaintiff's history was "not truly consistent with what one would expect in an individual with fibromyalgia." (Id. at 346.)   She further found that Plaintiff had a history of low-back pain but "fairly normal ranges of motion" and "no significant evidence of radiculopathy," while radiographs taken that day did not demonstrate significant pathology.   (Id.)   Dr. Siciarz-Lambert concluded that Plaintiff should be limited to pushing, pulling, lifting, and carrying 50 pounds occasionally and 25 pounds frequently, but he had no other limitations.   (Id.)

On September 10, 2009, Steven I. Brawer, a clinical psychologist, performed a psychological evaluation at SSA's request.   (AR 349-55.)   After an interview and psychological testing of Plaintiff, Brawer diagnosed him with depressive disorder secondary to general medication condition and noted that his nonverbal intelligence was in the borderline/low-average range.   (AR 354.)   Brawer found that Plaintiff could be mildly diminished in his ability to sustain concentration and attention,

---

[3]   Fibromyalgia is a "[r]heumatic syndrome of pain in connective tissues and muscles without muscle weakness, characterized by general body aches, multiple tender areas, fatigue, sleep disturbances, and reduced exercise tolerance; seen most frequently among women 20 to 50 years of age; cause is unknown."   Ida G. Dox et al., Attorney's Illustrated Medical Dictionary 55 (Supp. 2004).   Diagnosis is made based on widespread pain for at least three months and pain on digital palpation present in at least 11 of 18 specific sites on the body.   Id.; see also SSR 12-2P, 2012 WL 3104869, at *2-3 (listing diagnostic criteria for fibromyalgia).

effectively manage work stress, persist for a regular workday, and sustain stamina.  (Id.)  He concluded that Plaintiff would be able to perform simple, repetitive tasks and "may be able to perform some detailed, varied, or complex nonverbal tasks"; he was also "capable of following a routine and organizing himself for basic tasks," working independently, and "sustaining cooperative relationships with coworkers and supervisors."  (Id.)

On October 9, 2009, Dr. Babaran noted that Plaintiff complained of pain and swelling in his lower right leg, and he diagnosed neuropathy.  (AR 569.)  On October 20, 2009, psychiatrist L.O. Mallare, an SSA medical consultant, reviewed Plaintiff's records and completed a Mental Residual Functional Capacity Assessment.[4]  (AR 356-58.)  Dr. Mallare opined that Plaintiff had moderate limitations in his ability to understand, remember, and carry out detailed instructions, but he was not significantly limited in any other respect.  (Id.)  He concluded that Plaintiff had "adequate mental function to perform 1-2 step and some detailed instr[uctions]" and was able to interact appropriately with others and adapt to simple changes in the workplace.  (AR 358.)  Dr. Mallare also completed a Psychiatric Review Technique form, finding that Plaintiff had an affective disorder that resulted in mild restriction of activities of daily living; mild difficulties in maintaining social functioning; and mild difficulties in maintaining concentration, persistence, and pace.  (AR 359-69.)  Dr. Mallare noted that there was

---

[4]    Although Dr. Mallare does not indicate his area of expertise, the ALJ indicated that he was a psychiatrist.  (See AR 16.)

11

1  insufficient evidence of periods of decompensation.  (AR 367.)

2      Also on October 20, 2009, SSA medical consultant Dr. L.
3  Schwartz reviewed Plaintiff's records and completed a Physical
4  Residual Functional Capacity Assessment.  (AR 370-74.)  Dr.
5  Schwartz found that Plaintiff had diagnoses of fibromyalgia and
6  cervical strain but could occasionally lift and/or carry 50
7  pounds, frequently lift and/or carry 25 pounds, stand and/or walk
8  for about six hours in an eight-hour workday, and sit for about
9  six hours in an eight-hour workday.  (AR 370-71.)

10      On October 27, 2009, Dr. Stanley Tu at Crown City Medical
11  Group noted Plaintiff's complaints of burning feeling in his
12  right leg and diagnosed neuropathy.  (AR 568.)  On November 6,
13  2009, Dr. Arthur E. Lipper, a board-certified internist, found
14  that Plaintiff had gastroesophageal reflux disease and
15  heliocobacter pylori infection but did not have a hernia.  (AR
16  379.)

17      On October 30, 2009, Dr. Thomas Curtis, a board-certified
18  psychiatrist who had been treating Plaintiff since July 2009 as
19  part of a workers' compensation claim, completed a psychiatric
20  evaluation.[5]  (AR 313-41.)  Based on the results of several
21  psychological tests, Dr. Curtis diagnosed Plaintiff with
22  depressive disorder not otherwise specified with anxiety and
23  psychological factors affecting a medical condition and assigned

24

25

26

27  ────────────────

28      [5]  Although Dr. Curtis completed his exam on October 30,
    2009, his report was dated November 17, 2009.  (AR 313.)

                                 12

a global assessment of functioning ("GAF") score of 55.[6]  (AR
327.)  Dr. Curtis opined that Plaintiff had moderate impairment
in his ability to perform activities of daily living; moderate
impairment in social functioning; moderate impairment in
concentration, persistence, and pace; and moderate impairment in
his ability to adapt to worklike settings.  (AR 331-32.)  Dr.
Curtis noted that Plaintiff had been treated with psychotherapy,
biofeedback, and psychotropic medications, which had helped
alleviate his symptoms.  (AR 316.)  Dr. Curtis concluded that
Plaintiff was totally temporarily disabled "on a combined
physical and emotional basis."  (AR 329.)

On November 24, 2009, Dr. Gregg H. Small, who was board
certified in physical medicine and rehabilitation and
electrodiagnostic medicine, conducted EMG and nerve conduction
studies on Plaintiff, both of which were normal.  (AR 413-17.)

On December 21, 2009, Dr. Sobol found that Plaintiff had
residual tenderness over parts of his lumbar spine, positive
seated and supine straight-leg test, and reduced range of motion
of the lumbar spine.  (AR 425-26.)  He noted that Plaintiff had
"decreased sensation to pinprick and light touch in both lower
extremities, right side greater than left," but "no other focal
lower extremity deficits, including motor or reflex."  (AR 426.)

---

[6]     A GAF score represents a present rating of overall
psychological functioning on a scale of 0 to 100.  See Am.
Psychiatric Ass'n, Diagnostic and Statistical Manual of
Disorders, Text Revision 34 (4th ed. 2000).  A GAF score in the
range of 51 to 60 indicates "[m]oderate symptoms (e.g., flat
affect and circumstantial speech, occasional panic attacks) OR
moderate difficulty in social, occupational or school functioning
(e.g., few friends, conflicts with peers or co-workers)."  Id.

Plaintiff ambulated without appreciable limp or antalgia, and could heel- and toe-walk without gross abnormality. (Id.)  After noting the results of an October 26, 2009 MRI, Dr. Sobol diagnosed

> [l]umbosacral spine musculoligamentous sprain/strain, with MRI evidence of disc desiccation at L4-5 and L5-S1, moderately significant central canal stenosis at L4-5 secondary to 6 mm disc protrusion and short pedicles resulting in partial lateral recess obliteration, 2.5 mm disc protrusion with annular tear at L5-S1 and facet degenerative joint disease at L5-S1 greater than L4-5, per study dated October 25, 2009, with attendant right greater than left lower extremity radiculitis.

(AR 422, 427.)  Dr. Sobol also noted Plaintiff's complaints of depression, stress, and gastrointestinal upset. (Id.)  Dr. Sobol found that Plaintiff's back condition had attained maximum medical benefit and was permanent and stationary. (AR 428.)  He opined that Plaintiff was "precluded from activities requiring heavy lifting, repetitive bending and stooping and from very prolonged weight-bearing" and "should be off his feet for one hour out of an eight-hour workday."  (AR 434.)

On March 9, 2010, Dr. Lipper noted that Plaintiff's gastrointestinal symptoms were "50% better" after treatment with antibiotics but that he continued to have "mild upper GI symptoms."  (AR 463.)  On May 19, 2010, Dr. Curtis noted that Plaintiff had visible anxiety and depressed expressions.  (AR 474.)

On June 11, 2010, Dr. Ronald C. Woods, who worked with Dr.

14

1  Sobol, noted that Plaintiff was having a flare-up of his low-back
2  symptoms.  (AR 506.)  Dr. Woods noted that he would like to try
3  "conservative treatment" because Plaintiff had benefited from
4  that in the past.  (Id.)  He recommended chiropractic treatment
5  two times a week for four weeks and refilled Plaintiff's
6  prescriptions for Norco and Dendracin lotion.  (Id.)  Dr. Woods
7  opined that Plaintiff would be temporarily totally disabled for
8  six weeks.  (Id.)

9      On June 17, 2010, Dr. Babaran noted Plaintiff's complaint of
10  right-leg pain and diagnosed "tinea vs. neuropathy" and
11  "fibromyalgia."  (AR 560.)

12      On July 29, 2010, Dr. Sobol conducted a final orthopedic
13  evaluation.  (AR 494-501.)  Dr. Sobol found that Plaintiff's
14  lumbar spine had normal symmetry and contour, residual tenderness
15  with palpation, positive straight-leg test bilaterally, and
16  reduced ranges of motion.  (AR 496-97.)  A neurological exam
17  revealed "continued decreased sensation to pinprick and light
18  touch in both lower extremities, right side greater than left,"
19  but normal muscle bulk and tone, normal reflexes, no weakness on
20  motor testing, and no evidence of atrophy or spasticity.  (AR
21  497-98.)  Plaintiff's gait was normal with no evidence of limp or
22  antalgia, and he was able to heel-walk and toe-raise without
23  difficulty.  (AR 498.)  Dr. Sobol repeated his diagnosis from his
24  December 21, 2009 report but added a notation that Plaintiff had
25  "a recent history of flare-up now returned to its pre flare-up
26  levels." (AR 498.)  Dr. Sobol further noted that Plaintiff's
27  low-back symptoms had "essentially returned to their pre flare-up
28  levels in direct response to a home exercise program, including

use of a home electrical muscle stimulation unit along with prescription medication," and that his low-back condition had "re-stablized without evidence of new and further disability."[7] (AR 499.)  Dr. Sobol concluded that his "opinions relative to the issues of disability ha[d] not changed" since his "Permanent and Stationary Evaluation Report dated December 21, 2009."  (Id.)

On November 2, 2010, Dr. Sioson-Ayala completed a form certifying that she had diagnosed Plaintiff with fibromyalgia syndrome.  (AR 238.)  The form does not indicate that she conducted an examination that day, nor does it include any findings or diagnostic criteria that support the diagnosis. (Id.)  Dr. Sioson-Ayala stated on the form that Plaintiff had been under her care from "11-2-10," the same day as the diagnosis; before that, she apparently last treated Plaintiff on March 18, 2010. (AR 561.)

On November 17, 2010, Dr. Sobol completed a Fibromyalgia Residual Functional Capacity Questionnaire.  (AR 582-85.)  He opined that Plaintiff met the "American Rheumatological" criteria for fibromyalgia and stated that Plaintiff had multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, frequent severe headaches, numbness and tingling, anxiety, and depression.  (AR 582.)  Dr. Sobol stated that Plaintiff's other diagnosed impairments included anxiety, depression, sleep disorder, lumbar spine injury, and leg injury.

---

[7]    Plaintiff apparently did not receive the chiropractic care that Dr. Woods recommended.  (See AR 496 (noting that recommended chiropractic therapy "was not certified by the insurance carrier").)

16

(AR 582.)  He noted that Plaintiff had pain in his bilateral lumbosacral spine and bilateral legs, which would frequently interfere with his attention and concentration.  (AR 583.)  Dr. Sobol also found that Plaintiff had a slight limitation in his ability to deal with work stress.  (AR 583.)

Dr. Sobol opined that Plaintiff's impairments resulted in significant limitations.  Specifically, Plaintiff could walk only one to two blocks without rest or severe pain, sit continuously for only 30 minutes at a time, stand continuously for only 20 minutes at a time, sit for at least six hours in an eight-hour workday, and stand or walk for a total of less than two hours in an eight-hour workday.  (AR 583-84.)  He also found that Plaintiff would need to walk for five minutes every 15 minutes of an eight-hour workday; shift at will from sitting, standing, or walking; and take frequent 10-minute breaks.  (AR 583-84.) Plaintiff could occasionally lift and carry less than 10 pounds but never 10 pounds or more.  (AR 585.)  Dr. Sobol also believed that Plaintiff would be absent from work about twice a month as a result of his impairment or treatment.  (AR 585.)  At the time Dr. Sobol filled out the fibromyalgia questionnaire, in November 2010, he had not seen Plaintiff since July of that year and apparently did not base his findings in the questionnaire on a new examination of Plaintiff.  (AR 494-501.)

**VI.  DISCUSSION**

Plaintiff alleges that the ALJ erred in (1) determining that he retained the RFC to perform light work; (2) failing to properly assess whether his condition met or equaled a Listing; (3) failing to properly consider his subjective symptom

17

1  testimony; and (4) determining that he could perform a

2  significant number of jobs.[8]  (J. Stip. at 9.)

3       A.    The ALJ Did Not Err in Determining Plaintiff's RFC

4       Plaintiff contends that the ALJ erred in determining that he

5  retained the RFC to perform light work.  (J. Stip. at 19-29, 33-

6  34.)  Specifically, Plaintiff argues that the ALJ erred by (1)

7  rejecting the opinions of his treating physicians, Drs. Sobol and

8  Curtis (J. Stip. at 23-28), and (2) "isolating the effect of

9  [Plaintiff's] physical impairment from the effects of his mental

10 impairment" (J. Stip. at 29).

11      1.   Applicable law

12      A district court must uphold an ALJ's RFC assessment when

13 the ALJ has applied the proper legal standard and substantial

14 evidence in the record as a whole supports the decision.  Bayliss

15 v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).  The ALJ must

16 have considered all the medical evidence in the record and

17 "explain in [his or her] decision the weight given to . . . [the]

18 opinions from treating sources, nontreating sources, and other

19 nonexamining sources."  20 C.F.R. §§ 404.1527(e)(2)(ii),

20 416.927(e)(2)(ii).  In making an RFC determination, the ALJ may

21 consider those limitations for which there is support in the

22 record and need not consider properly rejected evidence or

23 subjective complaints.  See Batson v. Comm'r of the Soc. Sec.

24 Admin., 359 F.3d 1190, 1197-98 (9th Cir. 2004) ("ALJ was not

25

26

27      [8]    The Court has rearranged the order in which it
   addresses Plaintiff's claims from that followed by the parties,
28 in order to avoid repetition and for other reasons.

18

1   required to incorporate evidence from the opinions of
2   [plaintiff's] treating physicians, which were permissibly
3   discounted"); Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC
4   determination because "the ALJ took into account those
5   limitations for which there was record support that did not
6   depend on [claimant's] subjective complaints").

7        An ALJ does not need to adopt any specific medical source's
8   RFC opinion as his or her own. Vertigan v. Halter, 260 F.3d
9   1044, 1049 (9th Cir. 2001) ("It is clear that it is the
10  responsibility of the ALJ, not the claimant's physician, to
11  determine residual functional capacity."); 20 C.F.R.
12  §§ 404.1546(c), 416.946(c) ("[T]he administrative law judge . . .
13  is responsible for assessing your residual functional
14  capacity.").  "The ALJ need not accept the opinion of any
15  physician, including a treating physician, if that opinion is
16  brief, conclusory, and inadequately supported by clinical
17  findings."  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir.
18  2002); accord Batson, 359 F.3d at 1195.  The Court must consider
19  the ALJ's decision in the context of "the entire record as a
20  whole," and if the "evidence is susceptible to more than one
21  rational interpretation, the ALJ's decision should be upheld."
22  Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008)
23  (internal quotation marks omitted).

24            2.  Discussion
25       The ALJ found that Plaintiff retained the RFC to perform
26  light work "except that [Plaintiff] can perform postural
27  activities occasionally, cannot climb ladders, ropes, or
28  scaffolds, cannot work around heights and hazards, and is limited

19

1  to simple to moderately complex work." (AR 13.)  He further

2  stated that in making that RFC finding, he "considered all

3  symptoms and the extent to which these symptoms can reasonably be

4  accepted as consistent with the objective medical evidence and

5  other evidence" and "also considered opinion evidence."  (Id.)

6  Plaintiff argues that the ALJ's RFC finding was improper because

7  it did not reflect the findings of his treating doctors, Drs.

8  Sobol and Curtis.  (J. Stip. at 27.)

9      Three types of physicians may offer opinions in social

10 security cases: "(1) those who treat the claimant (treating

11 physicians); (2) those who examine but do not treat the claimant

12 (examining physicians); and (3) those who neither examine nor

13 treat the claimant (non-examining physicians)."  Lester, 81 F.3d

14 at 830.  The opinions of treating physicians are generally

15 afforded more weight than those of nontreating physicians because

16 treating physicians are employed to cure and have a greater

17 opportunity to know and observe the claimant.  Smolen v. Chater,

18 80 F.3d 1273, 1285 (9th Cir. 1996).  The weight given a treating

19 physician's opinion depends on whether it was supported by

20 sufficient medical data and was consistent with other evidence in

21 the record.  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  If a

22 treating physician's opinion was well supported by medically

23 acceptable clinical and laboratory diagnostic techniques and was

24 not inconsistent with other substantial evidence from the record,

25 it should be given controlling weight and should be rejected only

26 for "clear and convincing" reasons.  Lester, 81 F.3d at 830;

27 §§ 404.1527(c)(2), 416.927(c)(2).  When a treating physician's

28 opinion conflicts with other medical evidence or was not

20

supported by clinical or laboratory findings, the ALJ must
provide only "specific and legitimate reasons" for discounting
that doctor's opinion.  Orn v. Astrue, 495 F.3d 625, 632 (9th
Cir. 2007).  Factors relevant to the evaluation of a treating
physician's opinion include the "[l]ength of the treatment
relationship and the frequency of examination" as well as the
"[n]ature and extent of the treatment relationship."
§§ 404.1527(c)(2)(i)-(ii), 416.927(c)(2)(i)-(ii).

     The ALJ gave specific and legitimate reasons for discounting
Dr. Sobol's November 2010 fibromyalgia questionnaire, which
conflicted with the opinions of Drs. Siciarz-Lambert and Schwartz
as well as Dr. Sobol's own treatment notes and previous
assessments.  See Orn, 495 F.3d at 632.  In the questionnaire,
Dr. Sobol stated that Plaintiff's impairments resulted in, among
other things, lumbar spine and bilateral leg pain, muscle
weakness, frequent severe headaches, numbness, and tingling.  (AR
582-83.)  Dr. Sobol found that Plaintiff could walk only one or
two blocks without rest or severe pain, sit for only 30 minutes
at a time, stand for only 20 minutes at a time, and stand or walk
for less than two hours in an eight-hour day; Plaintiff also
needed to walk for five of every 15 minutes in an eight-hour
workday and take "frequent" unscheduled 10-minute breaks.  (AR
584.)  Dr. Sobol also opined that Plaintiff could occasionally
lift less than 10 pounds but never more than that.  (AR 585.)

     As the ALJ found (AR 16), Dr. Sobol's fibromyalgia
questionnaire was not "well supported" by the "minimal objective
findings" in his previous evaluations or the findings of
examining physician Dr. Siciarz-Lambert.  (AR 16.)  Dr. Sobol's

1   earlier reports made little or no mention of fibromyalgia,
2   instead attributing Plaintiff's symptoms to a work-related back
3   impairment and resulting gastrointestinal problems and
4   depression.  (See, e.g., AR 419-36, 494-501.)  Dr. Sobol noted
5   muscle weakness in the questionnaire (AR 582-83), but that is not
6   a symptom of fibromyalgia.  See Dox et al., supra, at 55.  In any
7   event, only four months earlier, in July 2010, Dr. Sobol had
8   found that Plaintiff had normal muscle bulk and tone with no
9   atrophy, spasticity, or motor weakness.  (AR 497-98.)  At that
10  time, Dr. Sobol also affirmed his December 2009 conclusion that
11  Plaintiff's only work restrictions were to be off his feet for
12  one hour in an eight-hour workday and to avoid heavy lifting,
13  repetitive bending and stooping, and "very prolonged" weight
14  bearing (AR 434, 499), which was largely consistent with Dr.
15  Siciarz-Lambert's finding that Plaintiff could lift and carry 50
16  pounds occasionally and 25 pounds frequently (AR 346) and Dr.
17  Schwartz's finding that Plaintiff could lift and carry 50 pounds
18  occasionally and 25 pounds frequently and could stand and/or walk
19  for six hours in an eight-hour workday (AR 371).  Contrary to his
20  previous findings and those of Drs. Siciarz-Lambert and Schwartz,
21  Dr. Sobol listed very significant limitations in the fibromyalgia
22  questionnaire, stating, for example, that Plaintiff could not
23  walk for more than one or two blocks, could never lift ten pounds
24  or more, and had to walk for five of every 15 minutes of an
25  eight-hour workday.  (AR 584-85.)  Dr. Sobol's fibromyalgia
26  questionnaire could therefore be rejected because it was
27  inconsistent with the substantial evidence of record and
28  unsupported by his own treatment notes.  See Connett v. Barnhart,

1   340 F.3d 871, 875 (9th Cir. 2003) (treating doctor's opinion

2   properly rejected when treatment notes "provide no basis for the

3   functional restrictions he opined should be imposed on

4   [claimant]"); Valentine v. Comm'r, Soc. Sec. Admin., 574 F.3d

5   685, 692-93 (9th Cir. 2009) (contradiction between treating

6   physician's opinion and his treatment notes constitutes specific

7   and legitimate reason for rejecting treating physician's

8   opinion); Batson, 359 F.3d at 1195 ("an ALJ may discredit

9   treating physicians' opinions that are conclusory, brief, and

10  unsupported by the record as a whole . . . or by objective

11  medical findings"); Rollins v. Massanari, 261 F.3d 853, 856 (9th

12  Cir. 2001) (ALJ permissibly rejected treating physician's opinion

13  when opinion was contradicted by or inconsistent with the

14  treatment reports); SSR 12-2P, 2012 WL 3104869, at *2 (in

15  evaluating whether person has medically determinable impairment

16  of fibromyalgia, ALJ "will review the physician's treatment notes

17  to see if they are consistent with the diagnosis of

18  [fibromyalgia]").

19       Moreover, nothing indicates that Dr. Sobol reviewed

20  Plaintiff's medical history or conducted a physical exam before

21  diagnosing fibromyalgia, nor did he make sufficient specific

22  findings to support that diagnosis, such as a history of

23  widespread pain, pain on palpation of at least 11 of 18 tender

24  points, or the exclusion of other disorders that could have

25  caused Plaintiff's symptoms.  See Dox et al., supra, at 55.

26  Thus, Dr. Sobol's diagnosis of fibromyalgia is itself not well

27  supported.  See SSR 12-2P, 2012 WL 3104869, at *2-3 (noting that

28  ALJ "cannot rely upon the physician's [fibromyalgia] diagnosis

23

alone" and that medical evidence "must document that the
physician reviewed the person's medical history and conducted a
physical exam" and that person displayed specific diagnostic
criteria).

In according little weight to Dr. Sobol's findings in the
fibromyalgia questionnaire, the ALJ also noted Plaintiff's
"fairly normal activities of daily living." (AR 16.)  Indeed,
Brawer's psychological evaluation, which the ALJ cited (id.),
noted that Plaintiff was able to dress and bathe himself, do
light household chores, cook, shop, run errands, walk outside,
watch television, converse with friends and family, read, drive
alone, and get along well with people. (AR 351.)  Plaintiff also
reported that he helped with housecleaning, went to the post
office and grocery store without assistance, and drove his own
car, among other things. (AR 53, 189-90.)  Dr. Sobol's finding
that Plaintiff was severely restricted in his activities — for
example, that he was unable to walk for more than one to two
blocks without resting or experiencing severe pain, could sit for
only 30 minutes and stand for only 20 minutes at a time, and
could only occasionally lift less than 10 pounds and never 10
pounds or more — was inconsistent with Plaintiff's actual
activities.  Dr. Sobol's findings were even inconsistent with
Plaintiff's own testimony at the November 3, 2010 hearing: he
stated that he could walk 15 minutes before having to stop, stand
for one hour, sit for two hours at a time, and lift about 15
pounds. (AR 49.)  Dr. Sobol's findings could be discounted on
that basis as well.  See Rollins, 261 F.3d at 856 (ALJ's finding
that doctor's "restrictions appear to be inconsistent with the

24

level of activity that [plaintiff] engaged in by maintaining a household and raising two young children, with no significant assistance from her ex husband," was specific and legitimate reason for discounting opinion); <u>Morgan v. Comm'r of Soc. Sec. Admin.</u>, 169 F.3d 595, 601-02 (9th Cir. 1999) (ALJ permissibly rejected treating physician's opinion when it conflicted with plaintiff's activities); <u>see also</u> <u>Fisher v. Astrue</u>, 429 F. App'x 649, 652 (9th Cir. 2011) (conflict between doctor's opinion and claimant's daily activities was specific and legitimate reason to discount opinion).

Moreover, the ALJ was entitled to credit the opinion of Dr. Siciarz-Lambert instead of Dr. Sobol because that opinion was supported by independent clinical findings and thus constituted substantial evidence upon which the ALJ could properly rely. <u>See Tonapetyan v. Halter</u>, 242 F.3d 1144, 1149 (9th Cir. 2001); <u>Andrews v. Shalala</u>, 53 F.3d 1035, 1041 (9th Cir. 1995). Dr. Siciarz-Lambert performed a physical exam of Plaintiff on August 7, 2009, noting, among other things, normal ranges of movement in the upper and lower extremities; negative straight-leg testing bilaterally; normal motor strength, tone, and bulk; normal reflexes; normal gait; and intact sense to light touch in all upper and lower extremities. (AR 344-45.) She found that Plaintiff had positive tender-point testing on direct examination but no tender-point testing at all on discreet testing, and that a radiograph of his lumbar spine conducted that same day displayed no significant pathology. (AR 344-46.) Dr. Siciarz-Lambert concluded that Plaintiff was limited to pushing, pulling, lifting, and carrying 50 pounds occasionally and 25 pounds

frequently.  (AR 346.)   Indeed, as previously noted, Dr. Siciarz-Lambert's conclusion was generally consistent with Dr. Sobol's most recent actual examination assessments, which stated that Plaintiff's work restrictions mandated only that he be off his feet for one hour of an eight-hour workday and avoid heavy lifting, repetitive bending and stooping, and "very prolonged" weight bearing.  (AR 434, 499.)   In any event, any conflict in the properly supported medical-opinion evidence was the sole province of the ALJ to resolve.  See Andrews, 53 F.3d at 1041.

Plaintiff does not specifically address the ALJ's reasons for according less weight to Dr. Sobol's fibromyalgia questionnaire; instead, he merely notes that Dr. Sobol had been Plaintiff's treating physician since 2001, summarizes his findings, and concludes that the ALJ "failed to properly weigh" Dr. Sobol's statement and instead "totally disregard[ed]" it. (J. Stip. at 21-26.)  As discussed above, however, the ALJ in fact properly considered Dr. Sobol's fibromyalgia questionnaire and gave specific and legitimate reasons, supported by substantial evidence, for rejecting it.

The ALJ also properly assessed Dr. Curtis's opinion, along with the other medical records, when determining that Plaintiff retained the mental capacity to perform simple to moderately complex work.  The ALJ noted Dr. Curtis's diagnoses of depressive disorder not otherwise specified with anxiety and psychological factors affecting medical condition, and his assignment of a GAF score of 55, which indicated moderate psychological impairment. (AR 15, 327.)   The ALJ further noted Dr. Curtis's May 2010 notation that Plaintiff had "visible anxiety" and "depressed

1  expressions."  (AR 15, 474.)  The ALJ's limitation to "simple to

2  moderately complex work" is largely consistent with Dr. Curtis's

3  findings of only moderate mental limitations.  Indeed, Dr. Curtis

4  specifically noted that Plaintiff's moderate impairments were

5  "compatible with some but not all useful functioning" in the

6  areas of adaptation and concentration, persistence and pace, and

7  that Plaintiff "would be able to tolerate the stresses common to

8  the work environment including maintaining attendance, making

9  decisions, doing scheduling, completing tasks and interacting

10  appropriately with supervisors and peers."  (AR 332.)

11      To the extent the RFC finding was inconsistent with Dr.

12  Curtis's opinion, moreover, the ALJ properly relied on the

13  opinions of Dr. Mallare and Brawer.  (AR 16.)  The ALJ was

14  entitled to credit the opinions of Dr. Mallare and Brawer instead

15  of Dr. Curtis because those opinions were supported by

16  independent clinical findings and thus constituted substantial

17  evidence upon which the ALJ could properly rely.  See Tonapetyan,

18  242 F.3d at 1149; Andrews, 53 F.3d at 1041.  Brawer examined

19  Plaintiff and conducted several psychological tests, including

20  the Comprehensive Test of Nonverbal Intelligence; Memory for

21  Designs Test; Trails A - Trails B; Bender Gestalt Visual Motor

22  Test, Second Edition; and Test of Memory Malingering.  (AR 349-

23  55.)  Based on the exam and test results, Brawer found that

24  Plaintiff could perform simple, repetitive tasks and might be

25  able to perform some detailed, varied, or complex nonverbal

26  tasks.  (AR 354.)  He was also able to follow a routine, organize

27  himself for basic tasks, and sustain "cooperative relationships"

28  with coworkers and supervisors.  (Id.)  Dr. Mallare relied on

27

1  Brawer's independent findings to conclude that Plaintiff had mild
2  restriction of activities of daily living, mild difficulties in
3  maintaining social functioning, and mild difficulties in
4  maintaining concentration, persistence, or pace.  (AR 367, 369.)
5  Dr. Mallare also found "insufficient evidence" of episodes of
6  decompensation.  (AR 367.)  Dr. Mallare concluded that Plaintiff
7  had adequate mental functioning to perform one- to two- step
8  instructions and some detailed instructions; he could also
9  interact appropriately with others and adapt to simple workplace
10 changes.  (AR 358.)  As the ALJ noted (AR 16), Dr. Mallare's
11 mental-RFC finding was consistent with Plaintiff's statements to
12 Brawer that he could dress and bathe himself without assistance,
13 do light household chores and cooking, go shopping, run errands,
14 walk, drive alone, watch television, converse with friends and
15 family, and read (AR 351; see also AR 52-53 (Plaintiff's
16 testimony that daily activities included housecleaning, meal
17 preparation, going to store, buying and reading paper, paying
18 bills, picking up child from school, and helping his children
19 after school); 189-90 (pain questionnaire stating that daily
20 activities included light housekeeping, errands, and driving
21 car)).  Indeed, Plaintiff reported to Brawer that he gets along
22 well with the people he comes in contact with on a daily basis
23 (AR 351), which indicates, consistent with Dr. Curtis's and
24 Brawer's findings (AR 332, 354), that Plaintiff would be able to
25 interact with supervisors and coworkers.  Thus, the ALJ did not
26 err in relying on Brawer's and Dr. Mallare's opinions in
27 formulating his RFC assessment because they were largely
28 consistent with each other and with other independent evidence in

28

the record, including Plaintiff's daily activities and the results of psychological testing.  See Tonapetyan, 242 F.3d at 1149 (opinion of nonexamining medical expert "may constitute substantial evidence when it is consistent with other independent evidence in the record").  In any event, any conflict in the properly supported medical-opinion evidence was the sole province of the ALJ to resolve.  See Andrews, 53 F.3d at 1041.

Finally, Plaintiff argues that the ALJ erred in formulating Plaintiff's RFC because he "fail[ed] to support that he properly considered [Plaintiff's] combination of impairments" as described by Drs. Sobol and Curtis.  (J. Stip. at 28-29.)  However, as discussed above, the ALJ properly considered Drs. Sobol's and Curtis's opinions when formulating Plaintiff's RFC.  Moreover, the ALJ considered Plaintiff's restrictions resulting from both his physical and mental limitations, as evidenced by the limitation to "simple to moderately complex work."  (AR 13.) Plaintiff, moreover, fails to point to any specific, credited limitation resulting from his combined impairments that the ALJ failed to include in the RFC.  Reversal is therefore not warranted on this basis.

B.   The ALJ Did Not Err in Determining that Plaintiff's
     Condition Did Not Meet or Equal a Listing

Plaintiff contends that his "disc disease, fibromyalgia, the effects of medications, the chronic pain syndrome, and the mental limitations combined" met the criteria of Listing 1.04. (J. Stip. at 14.)  Plaintiff further argues that the ALJ erred in determining that he did not meet a Listing because the ALJ "failed to identify which Listing he was considering and did not

29

provide any explanation as to how he reached his conclusions."
(J. Stip. at 10.)

### 1.   Applicable law

At step three of the sequential disability-evaluation process, the ALJ must evaluate the claimant's impairments to see if they meet or medically equal any of the impairments listed in the Listings.  See 20 C.F.R §§ 404.1520(d), 416.920(d); Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  The claimant has the initial burden of proving that an impairment meets or equals a Listing.  See Sullivan v. Zebley, 493 U.S. 521, 530-33, 110 S. Ct. 885, 891-92, 107 L. Ed. 2d 967 (1990).  "To *meet* a listed impairment, a claimant must establish that he or she meets each characteristic of a listed impairment relevant to his or her claim."  Tackett, 180 F.3d at 1099.  "To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment, or, if a claimant's impairment is not listed, then to the listed impairment 'most like' the claimant's impairment."  Id. (citing 20 C.F.R. § 404.1526).  Medical equivalence, moreover, "must be based on medical findings"; "[a] generalized assertion of functional problems is not enough to establish disability at step three."  Id. at 1100 (citing 20 C.F.R. § 404.1526).

An ALJ "must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment."  Lewis v. Apfel, 236 F.3d 503, 512 (9th Cir. 2001).  The ALJ, however, need not "state why a claimant failed to satisfy every different section of the listing of

1   impairments." Gonzalez v. Sullivan, 914 F.2d 1197, 1201 (9th

2   Cir. 1990) (finding ALJ did not err in failing to state what

3   evidence supported conclusion that, or discuss why, claimant's

4   impairments did not satisfy a Listing).  Moreover, the ALJ "is

5   not required to discuss the combined effects of a claimant's

6   impairments or compare them to any listing in an equivalency

7   determination, unless the claimant presents evidence in an effort

8   to establish equivalence." Burch v. Barnhart, 400 F.3d 676, 683

9   (9th Cir. 2005) (citing Lewis, 236 F.3d at 514).

10      An ALJ's decision that a plaintiff did not meet a Listing

11  must be upheld if it was supported by "substantial evidence."

12  See Warre v. Comm'r of Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th

13  Cir. 2006).  Substantial evidence is "more than a mere scintilla

14  but less than a preponderance; it is such relevant evidence as a

15  reasonable mind might accept as adequate to support a

16  conclusion." Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir.

17  1997).  When evidence was susceptible to more than one rational

18  interpretation, the Court must uphold the ALJ's conclusion as

19  long as substantial evidence existed to support it.  Id.

20          2.  Discussion

21      Plaintiff argues that his back condition, whether considered

22  alone or in combination with his other impairments, meets the

23  general requirements of Listing 1.04.  (J. Stip. at 9-14.)  A

24  claimant can meet Listing 1.04 if he has a disorder of the spine,

25  such as "herniated nucleus pulposus, spinal arachnoiditis,[9]

26

27          [9]  "Arachnoiditis describes a pain disorder caused by the

28  inflammation of the arachnoid, one of the membranes that surround
    and protect the nerves of the spinal cord."  NINDS Arachnoiditis

spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, [or] vertebral fracture," that results in compromise of the nerve root or spinal cord and either:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in

_____

Information Page, Nat'l Inst. of Neurological Disorders and Stroke, Nat'l Inst. of Health, available at http://www.ninds.nih.gov/disorders/arachnoiditis/arachnoiditis.htm (last accessed Nov. 18, 2012).

1   1.00B2b.[10]

2   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04.  To meet a Listing,

3   moreover, a claimant's impairments must "meet *all* of the

4   specified medical criteria." <u>Zebley</u>, 493 U.S. at 530.  "An

5   impairment that manifests only some of those criteria, no matter

6   how severely, does not qualify."  <u>Id.</u>

7       Although Plaintiff summarizes reports from several doctors,

8   he does not specifically explain how their findings correspond

9

10      [10]   Section 1.00B2b provides the following description
11   concerning "What [SSA] Mean[s] by Inability to Ambulate
    Effectively":

12
13      (1) Definition.  Inability to ambulate effectively means
    an extreme limitation of the ability to walk; i.e., an
14   impairment(s) that interferes very seriously with the
    individual's ability to independently initiate, sustain,
15   or complete activities.   Ineffective ambulation is
    defined generally as having insufficient lower extremity
16   functioning (<u>see</u> 1.00J) to permit independent ambulation
    without the use of a hand-held assistive device(s) that
17   limits the functioning of both upper extremities. . . .

18      (2) To ambulate effectively, individuals must be capable
    of sustaining a reasonable walking pace over a sufficient
19   distance to be able to carry out activities of daily
    living.  They must have the ability to travel without
20   companion assistance to and from a place of employment or
    school.   Therefore, examples of ineffective ambulation
21   include, but are not limited to, the inability to walk
    without the use of a walker, two crutches or two canes,
22   the inability to walk a block at a reasonable pace on
    rough or uneven surfaces, the inability to use standard
23   public transportation, the inability to carry out routine
    ambulatory activities, such as shopping and banking, and
24   the inability to climb a few steps at a reasonable pace
    with the use of a single hand rail.  The ability to walk
25   independently about one's home without the use of
    assistive devices does not, in and of itself, constitute
26   effective ambulation.
27

28   20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2b.

                                33

1   with the requirements of Listing 1.04A, 1.04B, or 1.04C (J. Stip.

2   at 9-14); in fact, the cited evidence fails to show that all of

3   their criteria were satisfied.  At minimum, Listing 1.04B

4   requires a diagnosis of spinal arachnoiditis, which must be

5   "confirmed by an operative note or pathology report of tissue

6   biopsy, or by appropriate medically acceptable imaging"; but

7   Plaintiff has failed to establish that any doctor diagnosed him

8   with that condition.  See 20 C.F.R. Part 404, Subpart P, App. 1,

9   § 1.04B.  Plaintiff has also failed to show that he has an

10  "inability to ambulate effectively" as required by Listing 1.04C;

11  on the contrary, he was often noted to have a normal gait or, at

12  most, only a slight limp (see, e.g., AR 393 (June 2009,

13  "ambulates with slight limp"), 426 (December 2009, "ambulates

14  without appreciable limp or antalgia") 498 (July 2010, normal

15  gait "with no evidence of limp or antalgia")), he did not use a

16  cane or other assistive device (AR 49), and he was able to shop

17  and run errands without assistance (AR 53, 189-90).

18      Plaintiff has also failed to establish that his back

19  impairment met the criteria of Listing 1.04A.  Plaintiff cites

20  Dr. Sobol's June 24, 2009 findings of decreased sensation to

21  pinprick and light touch (J. Stip. at 13; AR 393), but in the

22  same report, Dr. Sobol also found that Plaintiff had normal

23  muscle bulk and tone, no atrophy, spasticity, or motor weakness,

24  and normal reflexes (AR 393).  Dr. Sobol's December 21, 2009

25  report, which Plaintiff also summarizes, similarly notes that

26  Plaintiff had decreased sensation to pinprick and light touch in

27  his lower extremities but no other neurological symptoms and no

28

34

motor or reflex deficits.[11]  (AR 426.)  According to those
findings, therefore, Plaintiff's back condition did not result in
the "neuro-anatomic distribution of pain" or "motor loss"
required by Listing 1.04A.  See 20 C.F.R. Part 404, Subpart P,
App. 1, § 1.04A.  Thus, Plaintiff has not established that he
meets "all of the specified medical criteria" for Listing 1.04A,
1.04B, or 1.04C.  See Zebley, 493 U.S. at 530.

Plaintiff also asserts that his impairments, when considered
together, equaled Listing 1.04.  (J. Stip. at 13-14.)  In so
arguing, Plaintiff relies heavily on Dr. Sobol's November 2010
fibromyalgia questionnaire, but as discussed above, the ALJ
provided specific and legitimate reasons, supported by
substantial evidence, for rejecting that assessment.  Plaintiff
also summarizes other record evidence, such as Dr. Curtis's
opinion, but he fails to explain how any of it establishes that
his combination of impairments was "at least equal in severity
and duration" to the characteristics of Listing 1.04, and indeed,
that evidence fails to support such a finding.  See Tackett, 180
F.3d at 1099; see also 20 C.F.R. §§ 404.1529(d)(3) (when
considering equivalence, ALJ considers "whether your symptoms,
signs, and laboratory findings are at least equal in severity to
the listed criteria" and "will not substitute [claimant's]
allegations of pain or other symptoms for a missing or deficient
sign or laboratory finding to raise the severity of [his or her]
impairment(s) to that of a listed impairment"), 416.929(d)(3)
(same).  As such, Plaintiff has failed to establish that his

---

[11]  Plaintiff mistakenly states that this report was dated
December 21, 2010, not 2009.  (J. Stip. at 11.)

35

1   combination of impairments equaled a Listing.

2       Plaintiff also argues that the ALJ erred at step three by
3   failing to identify which Listing he was considering or explain
4   why he concluded that Plaintiff's impairments did not meet or
5   equal a Listing.  (J. Stip. at 10.)  Although it is true that the
6   ALJ found only that Plaintiff "does not have an impairment or
7   combination of impairments that meets or medically equals one of
8   the listed impairments in 20 CFR Part 404, Subpart P, Appendix
9   1," without specifically stating what evidence supported his
10  conclusion (AR 13), elsewhere in the decision he dedicated four
11  single-spaced pages to summarizing and analyzing the medical
12  evidence and Plaintiff's testimony (AR 13-17).  Because those
13  findings were sufficient to support the ALJ's step-three
14  conclusion that Plaintiff's impairments did not meet or equal a
15  Listing, he did not err.  See Gonzalez, 914 F.2d at 1201
16  (rejecting claimant's argument that ALJ erred by failing to
17  discuss why he did not satisfy Listing because four-page
18  "evaluation of the evidence" was "an adequate statement of the
19  foundations on which the ultimate factual conclusions are based"
20  (internal quotation marks omitted)); see also Lewis, 236 F.3d at
21  513 (ALJ must discuss and evaluate evidence that supports step-
22  three conclusion but need not do so under specific heading).
23  Moreover, the ALJ "is not required to discuss the combined
24  effects of a claimant's impairments or compare them to any
25  listing in an equivalency determination, unless the claimant
26  presents evidence in an effort to establish equivalence."  Burch,
27  400 F.3d at 683 (citing Lewis, 236 F.3d at 514).  Here, Plaintiff
28  has failed to point to any credited evidence of functional

1  limitations that would have affected the ALJ's analysis, nor has

2  he offered any plausible theory of how the combination of his

3  impairments equaled a Listing.  The ALJ did not commit reversible

4  error by failing to make additional findings at step three.[12]

5       C.   The ALJ Did Not Improperly Discount Plaintiff's

6            Subjective Symptom Testimony

7       Plaintiff next argues that the ALJ "failed to properly

8  consider" his subjective symptom testimony.  (J. Stip. at 34-39,

9  42-44.)  Reversal is not warranted on this basis, however,

10 because the ALJ made specific findings as to Plaintiff's

11 credibility that were consistent with the medical evidence of

12 record.

13           1.   Applicable law

14      An ALJ's assessment of pain severity and claimant

15 credibility is entitled to "great weight."  See Weetman v.

16 Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779

17 F.2d 528, 531 (9th Cir. 1986).  When the ALJ finds a claimant's

18 subjective complaints not credible, the ALJ must make specific

19 findings that support the conclusion.  See Berry v. Astrue, 622

20 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative evidence of

21 malingering, the ALJ must give "clear and convincing" reasons for

22 rejecting the claimant's testimony.  Lester, 81 F.3d at 834.  "At

23 the same time, the ALJ is not required to believe every

24 allegation of disabling pain, or else disability benefits would

25

26      [12]   Because the ALJ did not err in determining that
   Plaintiff's impairments did not meet or equal a Listing, the
27 Court has not addressed the Commissioner's argument that
   Plaintiff waived this issue by not raising it before the SSA.
28 (See J. Stip. at 16.)

1  be available for the asking, a result plainly contrary to 42

2  U.S.C. § 423(d)(5)(A)."  Molina v. Astrue, 674 F.3d 1104, 1112

3  (9th Cir. 2012) (internal quotation marks and citation omitted).

4  If the ALJ's credibility finding was supported by substantial

5  evidence in the record, the reviewing court "may not engage in

6  second-guessing."  Thomas, 278 F.3d at 959.

7         2.  Relevant facts

8  ____In June 2009, Plaintiff completed an SSA pain questionnaire.

9  (AR 188-90.)  Plaintiff stated that he had pain in his shoulders,

10  legs, and neck, which would spread to his toes, lower back, and

11  feet.  (AR 188.)  The pain occurred three to four times a week,

12  sometimes more often, and lasted four to six hours a day.  (Id.)

13  Plaintiff took pain medication, which sometimes helped, used an

14  electrical unit device and cold and hot packs, and attended

15  physical therapy.  (AR 189.)  No surgery was scheduled.  (Id.)

16  His usual daily activities included attending physical therapy

17  three times a week, light housekeeping, errands such as going to

18  the post office or grocery store without assistance, and driving

19  his own car.  (AR 189-90.)  Plaintiff said he could walk for two

20  blocks outside his home, stand for 15 minutes at a time, and sit

21  for one hour at a time.  (AR 190.)

22      At the hearing, Plaintiff testified that he had been

23  experiencing a lot of muscle pain.  (AR 50.)  He had been treated

24  with medication and physical therapy but had told his doctor that

25  he did not want pain injections or surgery.  (AR 48.)   Plaintiff

26  testified that he could walk 15 minutes before having to stop,

27  stand for one hour, sit for two hours at a time, and lift about

28  15 pounds.  (AR 49.)  Plaintiff did not need a cane or other

38

1  assistive device to walk.  (Id.)  During the day, Plaintiff
2  helped his wife with housecleaning chores, prepared his
3  children's meals, went to the store, bought and read the
4  newspaper, went to the post office, and paid bills.  (AR 53.)
5  Plaintiff also picked up his youngest child from school, which
6  was about two miles from the house, and helped his two children
7  when they came home from school.  (AR 52.)

8  _____ 3.  Analysis

9      The ALJ found that Plaintiff's "statements concerning the
10  intensity, persistence and limiting effects of [his] symptoms are
11  not credible to the extent they are inconsistent with the [RFC]
12  assessment."  (AR 13-14.)  Reversal is not warranted based on the
13  ALJ's alleged failure to make proper credibility findings or
14  properly consider Plaintiff's subjective symptoms.

15      The ALJ made specific, convincing findings in support of his
16  adverse credibility determination.  He noted that Dr. Sobol's
17  recent evaluations showed "relatively stable symptoms controlled
18  with pain medication and home exercise" and that Plaintiff had
19  not had surgery for his back condition.  (AR 17.)  The ALJ also
20  noted that Plaintiff's EMG and nerve conduction velocity testing
21  was normal.  (Id.)  Although Plaintiff alleged fibromyalgia
22  symptoms, the ALJ noted that Dr. Siciarz-Lambert had found a
23  discrepancy between discreet and direct tender-point testing for
24  fibromyalgia.  (Id.)  Indeed, Dr. Siciarz-Lambert concluded that
25  she could not endorse a fibromyalgia diagnosis because of that
26  discrepancy and because Plaintiff's history was not "truly
27  consistent with what one would expect in an individual with
28  fibromyalgia."  (AR 346.)  The ALJ also noted that "Social

39

Security staff did not notice that [Plaintiff] had any difficulty with his mental and physical abilities" (AR 17) and cited a field office disability report from a face-to-face interview stating that Plaintiff's behavior and appearance were "acceptable" and he did not appear to have difficulty understanding, concentrating, sitting, standing, walking, or writing, among other things (AR 17, 165).

Plaintiff argues that the medical evidence shows that he had "severe problems with his discs at two levels including a 6 mm disc bulge with pressure on the nerve root" (J. Stip. at 37); but the ALJ did not hold that Plaintiff had no impairments. Instead, as the ALJ correctly noted, Plaintiff's medically determinable impairments could be expected to cause the alleged symptoms, but Plaintiff's testimony concerning the "intensity, persistence and limiting effects" of those symptoms was not credible for the reasons identified by the ALJ. (AR 13-14.) The ALJ's reasons for rejecting Plaintiff's testimony in total constituted appropriate bases for discounting Plaintiff's subjective symptom testimony. See, e.g., Tommasetti, 533 F.3d at 1039 (ALJ may infer that claimant's "response to conservative treatment undermines [claimant's] reports regarding the disabling nature of his pain"); Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (holding that "contradictions between claimant's testimony and the relevant medical evidence" provided clear and convincing reasons for ALJ to reject plaintiff's subjective symptom testimony); see also SSR 96-7p, 1996 WL 374186, at *5 (ALJ may consider "any observations about the individual recorded by [SSA] employees during interviews, whether in person or by telephone").

1       Plaintiff argues that the ALJ erred in considering
2   Plaintiff's daily activities as evidence of his lack of
3   credibility. (J. Stip. at 36 (citing Benecke v. Barnhart, 379
4   F.3d 587, 594 (9th Cir. 2004)), 42-43 (citing Vertigan, 260 F.3d
5   at 1050).)  Although it is true that "[o]ne does not need to be
6   'utterly incapacitated' in order to be disabled," Benecke, 379
7   F.3d at 594 (citing Vertigan, 260 F.3d at 1050), the extent of a
8   claimant's activity can support a finding that the claimant's
9   reports of his impairment were not fully credible.  See Bray v.
10  Comm'r of Soc. Sec. Admin., 554 F.3d 1219, 1227 (9th Cir. 2009);
11  Curry v. Sullivan, 925 F.2d 1127, 1130 (9th Cir. 1990) (finding
12  that claimant's ability to "take care of her personal needs,
13  prepare easy meals, do light housework and shop for some
14  groceries . . . may be seen as inconsistent with the presence of
15  a condition which would preclude all work activity") (citing Fair
16  v. Bowen, 885 F.2d 597, 604 (9th Cir. 1989)).  Indeed, the Social
17  Security regulations specifically instruct an ALJ to consider
18  daily activities in making a credibility assessment.  20 C.F.R.
19  §§ 404.1529(c)(3), 416.929(c)(3); see also SSR 96-7p, 1996 WL
20  374186 at *3.  Even if the ALJ somehow erred by relying on this
21  factor, however, it was harmless because the ALJ gave other clear
22  and convincing reasons, supported by substantial evidence, for
23  his credibility determination.  See Carmickle v. Comm'r, Soc.
24  Sec. Admin., 533 F.3d 115, 1162-63 (9th Cir. 2008).

25      Finally, Plaintiff argues that the ALJ "did not comply with
26  the mandate of [SSR] 96-7p . . . which calls for an evaluation of
27  seven factors in assessing the credibility of one's subjective
28  complaints."  (J. Stip. at 38.)  To the extent Plaintiff argues

that the ALJ erred by failing to address each factor set forth in SSR 96-7p, his claim lacks merit.  SSR 96-7p identifies several factors that may be considered to determine a claimant's credibility, including (1) daily activities; (2) location, duration, frequency, and intensity of pain and other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication; (5) treatment, other than medication, for relief of pain or other symptoms; (6) any other measures the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning functional limitations and restrictions from pain or other symptoms.  SSR 96-7p, 1996 WL 374186, at *3.  Contrary to Plaintiff's claim, an ALJ is not required to discuss and analyze each of those factors.  See, e.g., Vang v. Astrue, No. 1:10cv01810 DLB, 2011 WL 3319548, at *8 (E.D. Cal. Aug. 1, 2011) ("ALJ is not required to discuss and analyze each and every one of the factors enumerated in SSR 96-7p"); Collins v. Astrue, No. CV 07-08082-OP, 2009 WL 1202891, at *6 (C.D. Cal. Apr. 27, 2009) (ALJ "was not required to discuss and analyze all of the factors enumerated in SSR 96-7p"; rather, he must only give them "consideration").

     In any event, the record as a whole reflects that the ALJ adequately considered the factors listed in SSR 96-7p.  In his decision, the ALJ specifically stated that he had considered "all symptoms" and the extent to which they could reasonably be accepted based on the requirements of, among other things, SSR 96-7p.  (AR 13.)  The ALJ then summarized the medical evidence

(AR 14-16), including notations that Plaintiff's right-leg pain increased with prolonged standing and weight bearing (AR 14) and his back condition improved with medication and home exercise (AR 15).  The ALJ also discussed Plaintiff's daily activities (AR 16-17); the location and nature of his alleged pain (id.); and his treatment with pain medication, home exercise, and physical therapy (id.).  During the hearing, the ALJ questioned Plaintiff about his daily activities (AR 52-53), medical treatment (AR 44-48), and the nature of his pain (AR 53-54).  Moreover, other than asserting that the ALJ failed to address the enumerated factors, Plaintiff cites nothing in the record to support his contentions regarding his allegedly disabling symptoms.  (J. Stip. at 34-39, 42-44.)  Thus, the ALJ adequately considered the factors enumerated in SSR 96-7p to support his adverse credibility finding.

     This Court may not "second-guess" the ALJ's credibility finding simply because the evidence may have been susceptible of other interpretations more favorable to Plaintiff.  See Tommasetti, 533 F.3d at 1039.  The ALJ reasonably and properly discredited Plaintiff's testimony regarding the severity of his symptoms and gave clear and convincing reasons for his adverse credibility finding.  Reversal is therefore not warranted on this basis.

          D.   The ALJ Properly Concluded That Plaintiff Could Perform
               a Significant Number of Jobs

     Plaintiff asserts that the ALJ improperly concluded that Plaintiff could perform jobs identified by the VE because the VE "responded to a hypothetical posed by the ALJ that did not

include the extent of [Plaintiff's] documented physical and
mental limitations." (J. Stip. at 44-47.) In so arguing,
Plaintiff contends that the ALJ failed to include, in the RFC and
the hypothetical to the VE, Dr. Sobol's findings in the
fibromyalgia questionnaire and Dr. Curtis's finding of moderate
impairments. (J. Stip. at 45.)

As discussed above, the ALJ's RFC finding was supported by
substantial evidence and was therefore proper; thus, to the
extent Plaintiff argues that the ALJ's determination that he
could perform other work was erroneous because it was based on an
improper RFC finding, that argument fails for the reasons
outlined above.[13] The ALJ properly posed a hypothetical to the
VE containing all the limitations he found credible based on the
evidence of record (AR 57-58); in response, the VE testified that
Plaintiff could perform three light, unskilled jobs that exist in
sufficient numbers in the local and national economy. (AR 58-59);
see Bayliss, 427 F.3d at 1218 (holding that because "[t]he
hypothetical that the ALJ posed to the VE contained all of the
limitations that the ALJ found credible and supported by
substantial evidence in the record," ALJ's "reliance on testimony

---

[13]   Plaintiff also argues that the ALJ "failed to properly
consider" the findings of the consultative examiner, presumably
Brawer, who "reported [Plaintiff] would be up to moderately
impaired in sustained concentration and attention, visual
tracking and mental ability in shifting sets." (J. Stip. at 45.)
Brawer, however, actually concluded that Plaintiff's ability to
sustain attention and concentration for extended periods may be
"mildly diminished" and noted that, during testing, Plaintiff
demonstrated "adequately-to-mildly diminished concentration,
persistence and pace in completing tasks." (AR 354.) As a
factual matter, therefore, this claim fails.

the VE gave in response to the hypothetical therefore was proper"). Reversal is therefore not warranted on this basis.

**VII. CONCLUSION**

Consistent with the foregoing, and pursuant to sentence four of 42 U.S.C. § 405(g),[14] IT IS ORDERED that judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice. IT IS FURTHER ORDERED that the Clerk serve copies of this Order and the Judgment on counsel for both parties.

DATED: December 7, 2012

JEAN ROSENBLUTH
U.S. Magistrate Judge

---

[14]   This sentence provides: "The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

45